**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| UNIVERSITY SQUARE REAL ESTATE HOLDINGS LLC,[1] | ) | |
| | ) | Case No. 23-12301-jps |
| | ) | |
| Debtor. | ) | Judge Jessica E. Price Smith |
| | ) | |

**DECLARATION OF IRINA PALCHUK IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Irina Palchuk, declare under penalty of perjury:

1. I am a Senior Vice President and Workout Specialist at UMB Bank, N.A. (the "Trustee"), which is the sole member (solely in its capacity as Trustee for the Bonds, as defined below) of University Square Real Estate Holdings LLC, a Delaware limited liability company ("USREH" or the "Debtor"). USREH is the fee simple title owner of two parcels in the shopping center known as "University Square" and located at the intersection of Cedar Road and Warrensville Center Road in University Heights, Ohio.

2. As the sole member of University Square, the Trustee, for the benefit of holders of the Bonds, is responsible for full and exclusive management of the business and affairs of the Debtor, including, among other things: (i) all restructuring activities and initiatives of the Debtor; (ii) cash management and liquidity forecasting; (iii) the development of, or revisions to, the Debtor's business decisions, including assistance with the sale process described herein; (iv) engagement with creditors and other stakeholders; and (v) contingency planning.

3. I have been a Senior Vice President at the Trustee since 2021. Previously, I served

---

1 The last four digits of the Debtor's tax identification numbers are 4180, and the location of the Debtor's business is 2203 Warrensville Center Road, University Heights, Ohio 44118.

in various roles at the Bank of New York Mellon, guiding teams in complex financial transactions. I also previously held financial and legal positions with US Bank National Association and Faegre & Benson, LLP (now known as Faegre Drinker Biddle & Reath LLP). Except as otherwise indicated, I base all facts set forth in this declaration (this "Declaration") on my personal knowledge, my review of business records, or my opinion based on my experience, knowledge, and information concerning the Debtor's operational and financial condition. If called to testify, I would testify competently to the facts set forth in this Declaration, which I am authorized to submit on behalf of the Debtor.

4. On the date hereof (the "Petition Date"), the Debtor commenced a voluntary case (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Ohio to, among other things, facilitate a going concern sale transaction or an orderly liquidation, if no sale can be accomplished. Ultimately, the Debtor intends to pursue a value-maximizing chapter 11 process through which the sale proceeds and other available proceeds will be distributed in accordance with the Bankruptcy Code.

5. As discussed in further detail below, this Chapter 11 Case was necessitated by the poor physical condition and long-deferred maintenance of property and the adjacent parking garage, the struggling operational and financial viability of USREH, certain restrictive development covenants that limited certain opportunities for redevelopment of University Square, and the unique structure and interests of many different public and private parties involved in University Square over the past two decades. Despite many efforts to market different segments of the University Square shopping center and negotiate with different parties in interest over the past few years, none of these efforts materialized into an executable, going-concern transaction for the Debtor outside of bankruptcy. As a result, the Debtor, in an exercise of its business judgment,

determined to pursue a postpetition sale of its property on an expedited timeline.

6. I submit this Declaration to describe the Debtor's background and the circumstances that led to this Chapter 11 Case. I also submit this Declaration in support of the relief requested by the Debtor in the "first day" applications and motions filed with the Court (collectively, the "First Day Pleadings"). By the First Day Pleadings, the Debtor seeks to, among other things: (i) ensure the continuation of the Debtor's operations and cash management system without interruption; and (ii) provide adequate assurance of payment to the Debtor's utility providers.

7. I am familiar with each of the First Day Pleadings. Absent the relief requested in the First Day Pleadings, I believe that the Debtor would suffer immediate and irreparable harm that would jeopardize its ability to continue its business operations and consummate a value-maximizing sale transaction. I further believe that the relief sought in the First Day Pleadings is critical to the Debtor's efforts to transition into chapter 11 efficiently and minimize disruptions to its business operations, thereby permitting the Debtor to preserve and maximize value while pursuing a section 363 sale. Finally, I believe that the First Day Pleadings reflect the thorough and targeted analyses of the Debtor's management team and their professional advisors, and capture relief that is critical to the success of this case.

8. This Declaration is divided into two parts. **Part I** describes the Debtor's business, history, and the circumstances leading to the commencement of this Chapter 11 Case. **Part II** summarizes the First Day Pleadings, and explains why the relief requested in those pleadings is appropriate under the circumstances and necessary to avoid immediate and irreparable harm to the estate, as applicable.

## I. DESCRIPTION OF THE DEBTOR

### A. The Debtor's Business and Property

9. USREH is the fee simple title owner of two of the seven parcels of land in University Square: (i) Parcel No. 721-01-001 (the "Core Retail Parcel") and (ii) Parcel No. 721-01-147 (the "Outparcel"). Macy's Retail Holdings, LLC ("Macy's") and Target Corporation ("Target") own the parcels on which their respective stores sit in University Square (Parcel Nos. 721-01-002, 721-01-004, and 721-01-301). Parcel No. 721-01-003 (the "Parking Garage Parcel") is owned by University Square Parking LLC, as further detailed below. Parcel No. 721-01-064/065 is privately owned. A parcel map of University Square, including the Core Retail Parcel and the Outparcel, is below:




10. The Core Retail Parcel consists of two multi-story structures totaling approximately 276,000 square feet of leasable space, and the Outparcel includes (i) a multi-tenant

building of approximately 5,100 square feet occupied only by a Verizon Wireless store and (ii) a free standing 5,400 square foot Key Bank branch.

11. USREH was formed in 2015 as a remote special purpose entity[2] to: (i) transitionally hold title to the Core Retail Parcel and Outparcel; (ii) secure and maintain USREH's property, including its interest in the parking garage and University Square as a whole; (iii) clear impediments to redevelopment; and (iv) identify a replacement developer for the Core Retail Parcel and the Outparcel with the goal of maximizing recovery for holders of the bonds that funded the construction of the public parking garage used by all of the University Square property owners and customers. Given the unique situation at the property, the Trustee has taken an untraditional and necessary approach to secure the property for the bondholders and the community at large. To fully understand the scope of the history of the Debtor and the complex and interrelated transactions that led to this point, however, a summary of the background of the property and the history that led to USREH's formation is necessary.

**B. History of the University Square Development**

12. In 2001 and 2002, Starwood Wasserman University Heights Holding LLC ("Starwood"), the original developer of University Square, began to redevelop the area into the structures that stand today. In 2001, the Cleveland-Cuyahoga County Port Authority issued two series of bonds: (i) Cleveland-Cuyahoga County Port Authority Senior Special Assessment/Tax Increment Revenue Bonds, Series 2001A (University Heights Ohio – Public Parking Garage Project) (Tax Exempt) and (ii) Cleveland-Cuyahoga County Port Authority Subordinate Tax Increment Revenue Bonds, Series 2001B (University Heights Ohio – Public Parking Garage Project) (Taxable) (collectively, the "Bonds"). The proceeds of the Bonds were used to:

[2] As a disregarded entity, USREH uses the tax identification number of UMB Bank, N.A.

(i) construct a public parking garage on the Parking Garage Parcel serving University Square (the "Parking Garage") and (ii) pay costs of issuance of the Bonds. The Trustee serves as the successor indenture trustee for the holders of the Bonds pursuant to the Trust Indenture dated as of December 1, 2001 originally between the Cleveland Cuyahoga County Port Authority and J.P. Morgan Trust Company, National Association (the "Trust Indenture").

13. To provide for and secure payment of principal and interest on the Bonds, the City of University Heights enacted Ordinance No. 2001-28, establishing a Tax Increment Financing District (the "TIF District") consisting of properties comprising the Parking Garage and Shopping Center (collectively the "TIF Parcels"), exempting certain improvements in assessed value on the TIF Parcels from real property taxes, and requiring owners of the TIF Parcels to pay service payments in lieu of taxes ("Service Payments") for a period of thirty years. The TIF Parcels include the Core Retail Parcel, the Parking Garage Parcel, the Outparcel, the parcels owned by Macy's and Target, and Parcel No. 721-01-064/065.

14. The Service Payments and all rights and liens associated therewith are pledged to the Trustee, for the benefit of the holders of the Bonds and are obligations which run with the land and encumber the TIF Parcels. As further security for the payment of the Bonds, the City enacted Ordinance No. 2001-66, pursuant to the City of University Heights levied special assessments (the "Special Assessments" and together with the Service Payments, the "Bond Revenues") on the Core Retail Parcel to the extent that Service Payments are insufficient to make required debt service payments on the Bonds. The Bond Revenues are the separate property of the trust estate for the Bonds (the "Trust Estate"), and they are not property of USREH.

15. In 2002, Starwood, Macy's, and Target entered into a Construction, Operating, and Reciprocal Easement Agreement ("COREA") governing the design of University Square, the

construction and operation of the buildings in University Square, and the maintenance of the buildings, including the Parking Garage. The COREA includes multiple provisions that govern the financial obligations of Starwood, Macy's, and Target with respect to the Parking Garage.

16. Starwood also formed University Square Parking, LLC ("USP"), with its initial members being Starwood, Macy's, and Target. Among other things, USP was created to: (i) manage, maintain and operate or cause to be managed, maintained and operated the Parking Garage and (ii) manage, maintain and operate or cause to be managed, maintained and operated the common areas of University Square. Starwood was the original owner of the Parking Garage Parcel, but conveyed it to USP in 2002.

17. Starwood paid the required Service Payments on the Core Retail Parcel until May 2005, when it conveyed its ownership interest in that parcel to Inland Western University Heights University Square, L.L.C, which subsequently changed its name to University Heights University Square, L.L.C. ("UHUS"). At that time, UHUS also acquired a membership interest in USP.

18. UHUS paid the required Service Payments on the Core Retail Parcel until 2013; the last Service Payment made in 2013 was on account of the first half payment of the amount owed for real estate taxes in 2012. In October 2013 UHUS conveyed its ownership interests in that parcel and other parcels, as well as its membership interest in USP, to University Heights Holding 4 LLC ("UHH4"). By virtue of that conveyance, UHH4 became liable for the Service Payments and any Special Assessment obligations of the Core Retail Parcel.

19. USP also continuously paid its Service Payments on the Parking Garage Parcel until 2013; the last Service Payment made in 2013 was on account of the first half payment of the amount owed for real estate taxes in 2012. Since the time UHH4 acquired its membership interest in USP in 2013, no Service Payments have been made on the Parking Garage Parcel. Between

2012 and January 2015, UHH4 also failed to make more than $10.3 million in required Service Payments and Special Assessments with respect to the Core Retail Parcel; Special Assessments began to be charged in 2013. The Parking Garage also fell into disrepair during this time.

20. Between 2013 and January 2015, UHH4 collected rents from tenants of the Shopping Center, but these funds were not applied to payment of the Service Payments or Special Assessments. As a result, the Bonds went into default, and the Trustee was appointed as successor indenture trustee pursuant to the Trust Indenture.

21. The holders of the Bonds have not received any principal repayments since UHH4 and USP began defaulting on their obligations to pay Service Payments and Special Assessments, as the Trustee has used the funds derived from the limited collection of Service Payments for the repair and maintenance of the Shopping Center and Parking Garage in order to protect the operations and value of University Square.

**C. Foreclosure and USREH's Operations**

22. Upon its appointment, the Trustee took immediate action to rectify some of the maintenance issues with the Parking Garage, funding over $100,000 in significant emergency repairs. It has continued to work on these issues to manage the property pursuant to the COREA through the Petition Date. In early 2015, and with the prior understanding and consent of both Cuyahoga County and the City of University Heights, the Trustee filed a complaint for the benefit of the holders of the bonds seeking damages on claims for breach of contract, foreclosure, and appointment of a receiver against UHH4 and USP in the Cuyahoga County Court of Common Pleas captioned *UMB Bank, N.A., as Trustee, et al., v. University Heights Holding 4 LLC, et al.*, Case No. CV-15-839988 (the "Lawsuit"). While the action was pending, the Trustee moved for and obtained the appointment of a receiver, Bradley A. Goldberg of Visconsi Realty Advisors, Inc., to take over management of the Shopping Center and Parking Garage, address immediate

safety matters, and ensure, among other things, amounts collected for common area maintenance charges were properly accounted for and applied. Visconsi still provides property management services for University Square and the Parking Garage as of the Petition Date.

23. Ultimately, the parties to the Lawsuit reached a settlement agreement, which was approved in December 2015. Among other things, the settlement agreement required UHH4 to: (i) execute and deliver to the Trustee a deed transferring fee simple title to the Core Retail Parcel and Outparcel to an entity to be designated by the Trustee, (ii) execute and deliver to the Trustee any and all additional documents requested by it to effectuate such transfer, (iii) execute and deliver to the Trustee any and all documents necessary to assign all leases and contract rights associated with the Core Retail Parcel and Outparcel to an entity to be designated by it, and (iv) execute and deliver to the Trustee any and all documents necessary to transfer and assign its membership interest in USP free and clear of any claims or liabilities to an entity to be designated by the Trustee.

24. USREH was established and designated as the entity that would take title to the Core Retail Parcel, the Outparcel, and the membership interest in USP. USREH has since managed these properties and its interest in the operation of the Parking Garage pursuant to the terms of the governing documents. USREH also worked with various architects, designers, and engaged in conversation with local government authorities to evaluate the condition of University Square, and understand the potential for redevelopment of the existing real estate.

25. Since taking title to the property, USREH has received written complaints from past and current tenants regarding the Parking Garage and general condition of University Square. Additionally, numerous reports prepared by professional engineers document deficiencies and deferred maintenance of the Parking Garage. Revenue streams for the properties at University Square (including the parcels owned by Target and Macy's) continue to decrease as the complex

has lost tenants, appraised values of the parcels for assessment purposes decrease, and the property struggles with maintenance issues. The City of University Heights has also informed USREH, Target, and Macy's on numerous occasions about its concerns regarding the condition and safety of University Square through official and unofficial notices. USREH does not have any employees; it uses the services of Visconsi to manage the Debtor's affairs and provide services to the Debtor's property.

### D. Marketing and Sale Process; Strategic Alternatives

26. USREH has also engaged in a series of formal and informal processes to evaluate potential strategic alternatives and solutions for the Debtor's property on a periodic basis since 2016. The Debtor evaluated various alternatives, including various options to reposition the use of the property to attract a broad spectrum of interested parties. In January 2019, USREH executed a letter of intent with a potential interested purchaser and subsequently executed a Property Purchase Agreement in February 2020, and that agreement has since been extended through July 21, 2023. Although USREH is not a party, this interested purchaser separately executed a nonbinding memorandum of understanding with the City of University Heights, Macy's and Target in early 2023 that summarizes the intent of the parties related to the potential purchaser's proposed development plans and financial commitments for the ongoing operation of University Square and the Parking Garage. While the potential purchaser remains interested, further negotiations with all interested parties have not been successful, and the Debtor has been forced to seek strategic alternatives in this Court due to its liquidity issues. The Debtor remains confident that a deal can be reached with the potentially interested purchaser or another interested party on an expedited basis during this Chapter 11 Case.

27. The Debtor intends to file a sale motion seeking this Court's approval to sell substantially all of its assets to an interested purchaser. Additionally, the Debtor intends to request

approval of bidding procedures that will govern the postpetition sale process. The proposed bidding procedures contemplate a postpetition marketing process seeking higher and better offers for the Debtor's assets. It is my understanding that the sale process under section 363 of the Bankruptcy Code proposed by the Debtor represents the best chance for maximizing value.

28. As the Debtor will support with further evidence, the Debtor has determined that it is necessary to seek expedited consideration of the bidding procedures given, among other things, limited available funding for the postpetition sale process, the length and scope of the prepetition marketing process that spans many years, and the unique complexities of the Debtor's property. The Debtor believes that completing the sale of the Debtor's assets through chapter 11 and on an expedited basis will provide the best chance of success for the business and its stakeholders. For the foregoing reasons, the Debtor concluded, in its business judgment, that filing the Chapter 11 Case and seeking approval of the sale process will maximize the value of its estate.

**E. The Debtor's Prepetition Capital Structure**

29. The liabilities of USREH include (i) routine vendor payables, (ii) common area maintenance charges, (iii) delinquent property taxes and Special Assessments due to Cuyahoga County in an aggregate amount of approximately $34.1 million, and (iv) a first lien mortgage of $4.0 million held by the Trustee, which holds a mortgage on the Core Retail Parcel and the Outparcel (the "<u>Mortgage</u>"). The mortgage secures USREH's obligations pursuant to a cognovit promissory note, pursuant to which theTrustee has periodically advanced funds to USREH for operations and expenses.

## II. SUMMARY OF THE FIRST DAY PLEADINGS[3]

30. Concurrently with the filing of this Chapter 11 Case, the Debtor has filed the First Day Pleadings. Having reviewed each of the First Day Pleadings or had their contents explained to me, I believe that the Debtor would suffer immediate and irreparable harm if the relief requested in the First Day Pleadings is not granted on the terms proposed. In my opinion, approval of the relief sought in the First Day Pleadings is critical to the Debtor's efforts to prosecute a value-maximizing sale process and conduct this case efficiently, thus permitting the Debtor to preserve and maximize value for the benefit of all stakeholders.

31. Several of the First Day Pleadings request authority to pay certain prepetition claims. I am told by the Debtor's legal advisors that Bankruptcy Rule 6003 provides, in relevant part, that the Court may not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this exception, the Debtor has limited its requests for immediate authority to those circumstances where a lack of relief failure would cause harm to the Debtor and its estate. The Debtor is not seeking approval of any postpetition financing at this time, but reserves the right to do so later as needed. With respect to the other First Day Pleadings, set forth below is the reasons why I believe it is imperative that the Court grant the relief requested.

### A. Cash Management Motion

32. Pursuant to the Cash Management Motion, the Debtor seeks, among other things: (i) authority to continue using its current cash management system (the "Cash Management System"), existing bank account (the "Bank Account"), and business forms (the "Business

---

[3] Capitalized, but otherwise undefined, terms used in this Section III shall have the meanings ascribed to such terms in the applicable First Day Pleading.

Forms"); (ii) authority to open and close Bank Accounts as necessary; (iii) authority for the Banks participating in the Cash Management System to honor certain transfers; and (iv) related relief.

33. As described in greater detail in the Cash Management Motion, the Debtor maintains a simple Cash Management System in the ordinary course of its operations, which includes one Bank Account at Huntington. The Debtor utilizes the Bank Account to manage payments from customers, make disbursements, including employee, vendor, and other operating payments, and to hold cash. It also allows the Debtor to control and monitor corporate funds, ensure cash availability, and reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balances and presentment information. The Debtor has the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments without closing the Bank Account and opening new ones.

34. In addition, the Business Forms are essential tools that assist the Debtor in transacting business with vendors and suppliers, who have come to associate these forms with the Debtor's business. Any disruption to the use of its existing Business Forms during this critical transition period could cause confusion or concern with the Debtor's vendors and contract counterparties. To the extent that the Debtor prints any new checks, they will include the designation "Debtor in Possession" and the case number.

35. I believe that the Cash Management System constitutes a customary and essential business practice, and it is similar to those commonly employed by entities of comparable size and complexity. The Debtor's continued use of the Cash Management System is critical to a successful chapter 11 process and a seamless transition to operation as a debtor in possession. Without the continued use of the Cash Management System, the Debtor could experience disruption in its cash receipts from tenants, which would cause interruption of payments to vendors and other cash

transactions that happen frequently. This would cause irreparable harm to the Debtor's business and could interfere with the Debtor's ability to consummate a going concern sale of its property. Accordingly, the Debtor respectfully requests that the relief set forth in the Cash Management Motion be approved.

**B. Utilities Motion**

36. Pursuant to the Utilities Motion, the Debtor seeks, among other things: (i) approval of the Debtor's proposed form of adequate assurance of postpetition payment to the Utility Companies, which includes providing approximately $8,500 in the aggregate in utility deposits to any requesting utilities during the Chapter 11 Case; (ii) approval of procedures for resolving any objections by the Utility Companies relating the Debtor's proposed adequate assurance procedures set forth in the Utilities Motion (the "Adequate Assurance Procedures"); (iii) a prohibition on the Utility Companies from altering, refusing, or discontinuing their services to, or discriminating against the Debtor solely on the basis of (a) the commencement of this Chapter 11 Case, (b) a debt that is owed by the Debtor for services rendered prior to the Petition Date, or (c) on account of any perceived inadequacy of the Debtor's proposed adequate assurance; and (iv) related relief.

37. Any disruption of the Debtor's Utility Services would cause irreparable harm to the Debtor's business operations, its estate, and the sale process, as it could result in the Debtor's inability to provide utility services to its tenants and operate its business. Without the protections afforded by the Adequate Assurance Procedures, the Debtor could be forced to address *ad hoc* requests by Utility Companies in a disorganized manner in the initial, critical stages of their chapter 11 process, when their efforts should be focused on stabilizing their operations and maximizing value for all of their stakeholders. The orderly process contemplated by the Adequate Assurance Procedures is necessary for a smooth transition by the Debtor into chapter 11 and will aid in their

chapter 11 efforts. Moreover, the Adequate Assurance Procedures will establish a fair process that will ensure all parties act in good faith.

38. This Chapter 11 Case simply will not succeed if the Debtor cannot be assured continual and uninterrupted Utility Services. Any disruption of the Utility Services could have a significant impact on the Debtor's business operations and efforts to maximize value for the estate. Accordingly, the Debtor respectfully requests that the relief set forth in the Utilities Motion be approved.

### C. Conclusion

39. For the reasons stated herein, and in each of the First Day Pleadings filed concurrently or in connection with this Chapter 11 Case, the Debtor respectfully requests that each First Day Pleadings be granted in its entirety, together with such other and further relief as the Court deems just and proper.

[*Remainder of Page Intentionally Left Blank*]

## CONCLUSION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: July 11, 2023

*/s/* Irina Palchuk

Irina Palchuk, Senior Vice President at UMB Bank, N.A., sole member of University Square Real Estate Holdings LLC (not individually but as successor indenture trustee under that certain Trust Indenture dated December 1, 2001 in respect of those certain Cleveland-Cuyahoga County Port Authority Senior Special Assessment/Tax Increment Revenue Bonds, Series 2001A (University Heights Ohio – Public Parking Garage Project) (Tax Exempt) and Cleveland-Cuyahoga County Port Authority Subordinate Tax Increment Revenue Bonds, Series 2001B (University Heights Ohio – Public Parking Garage Project) (Taxable))